164 So. 102

## SOUTHERN HOME INS. CO. OF THE CA-ROLINAS v. BOATWRIGHT.

### 7 Div. 305.

Supreme Court of Alabama.

Nov. 7, 1935.

Carl G. Moebes and Coleman, Spain, Stewart & Davies, all of Birmingham, for appellant.

James A. Embry, of Ashville, Frank B. Embry, of Pell City, and Victor H. Smith, of Birmingham, for appellee.

200

BROWN, Justice.

This is an action of assumpsit by the insured to recover the value of a dwelling house and its contents, consisting of household goods and personal effects, alleged to have been destroyed by fire on August 22, 1933, and insured against such destruction by a policy of insurance issued by the defendant on the 15th day of August, 1933.

The defendant filed two pleas in abatement, alleging that the plaintiff had failed of compliance with the requirements of the policy to furnish proof of loss. The elements of the proof of loss required, by the stipulations pleaded, are that within sixty days after the fire the insured "shall render a statement to this company, signed and sworn to by said insured, stating the knowledge and belief of the insured as to the time and origin of the fire; the interest of the insured and all others in the property; the cash value of each item thereof, and the amount of loss thereon; all incumbrances thereon; all other insurance, whether valid or not, covering any of said property, and a copy of all the descriptions and schedules in all policies; any changes in the title, use, occupation, location, possession, or exposures of said property since issuing (issuance) of this policy; by whom and for what purpose any building herein described and the several parts thereof were occupied at the time of the fire."

The pleas, in addition to the stipulations for furnishing proof of loss, also set out the requirement of the policy, that "if fire occurs the insured shall give immediate notice of any loss thereby in writing to this company," etc.

The pleas in abatement are not grounded on the plaintiff's failure of compliance with the last-quoted stipulation as to notice, but solely upon his failure to furnish proof of loss.

The averments of plaintiff's replication 2, that "the day following said fire, the

plaintiff made a verbal statement or report of said fire and of the destruction of, or damage to the property insured under said policy" to defendant's agent, McCain, might be a sufficient predicate to warrant the plaintiff in claiming a waiver of written notice under the last-quoted stipulation; but it is wholly insufficient to warrant the plaintiff in claiming a waiver of the provision for proof of loss. It does not appear that the alleged "verbal statement or report" was intended by the plaintiff, or accepted by the said McCain as such proof of loss; nor do the facts alleged in the pleas justify any such conclusion.

The same is true as to replication 3, in respect to the alleged dealing between the plaintiff and defendant's agent McCain. These averments are addressed to the question of notice—not proof of loss.

In so far as replication 3 rests a waiver of proof of loss on the acts of the defendant's "adjuster," construing its averments most strongly against the pleader, it does not appear from its averments whether said adjuster was defendant's general agent or general adjuster, or was a special adjuster, and if a special agent or adjuster, that he was acting within the line and scope of his authority. The replication avers that defendant "sent its adjuster *to said Ashville,* and that said adjuster interviewed the plaintiff"; not that he was sent to interview the plaintiff and adjust his loss. Non constat he was sent to Ashville on other business in no way connected with said loss. (Italics supplied.)

The replication (numbered 16) held sufficient in American Ins. Co. v. Millican, 228 Ala. 357, 153 So. 454, to quote from the opinion of the Court of Appeals, there under review, averred "that defendant waived the breach asserted in plea 9, in that it sent Norris [its adjuster] *to see plaintiff about adjusting the loss;* that Norris did see plaintiff; that plaintiff gave him whatever information he requested; and at that time Norris knew of the mortgage to Mollie Turney and recognized and treated the policy as binding on defendant and agreed with plaintiff to settle the loss." 153 So. 448, 450. (Italics supplied.)

The averment that the defendant sent its adjuster Norris to see plaintiff about adjusting the loss, regardless of whether he was a general or special adjuster, shows that he was acting within the line and scope of his agency in dealing with Millican in respect to Millican's loss. Not so here; the replication merely avers that "defendant sent its adjuster *to said Ashville.*" (Italics supplied.)

In Georgia Home Insurance Co. v. Allen, 128 Ala. 451, 460, 30 So. 537, 539, the utterance in Liverpool & London & Globe Insurance Co. v. Tillis, 110 Ala. 201, 17 So. 672, was quoted with approval: " 'Where, after a fire, an insurance company sends a person to the scene of the fire, *and authorizes him to act as an adjuster in the particular case,* with all the authority in reference thereto that is given to general adjusters, the insured, in dealing with such person, in the absence of notice to the contrary, has the right to presume he has authority to act for and bind the company as to all matters within the scope of his duties as the adjuster in the particular case and such special adjuster, by denying all liability under the policy, may waive the provision of the policy, requiring the assured to produce formal proofs of loss, as effectually as could the general adjuster of the company.' "

Said replication 3 does not in terms aver that said adjuster in doing the things set up therein as a waiver was acting within the line and scope of his authority; nor do the facts pleaded show that he was so acting. Moreover, said replication does not aver that said adjuster either denied liability, or that he agreed to pay said loss. Our judgment, therefore, is that the court erred in overruling the defendant's demurrers to plaintiff's replications 2 and 3. National Life & Accident Ins. Co. v. Moore, 216 Ala. 554, 114 So. 45; London & Lancashire Ins. Co., Limited v. McWilliams, 215 Ala. 481, 110 So. 909; Hanover Fire Ins. Co. v. Wood, 209 Ala. 380, 96 So. 250; Yorkshire Ins. Co., Limited v. Gazis, 215 Ala. 564, 112 So. 154.

There is an absence of evidence showing that the plaintiff made preliminary proof of loss; therefore, charge 12, given at plaintiff's request, was clearly abstract, but the giving of an abstract charge is not reversible error unless it is manifest from the record that the jury has been misled. Goldsmith & Davis v. McCafferty, 101 Ala. 663, 15 So. 244; Karpeles v. City Ice Delivery Co., 198 Ala. 449, 73 So. 642. Inasmuch as the judgment of the circuit court must be reversed for

the errors heretofore pointed out, we deem it unnecessary to determine whether or not the giving of said charge should work a reversal of the judgment.

Charge 13, given for plaintiff, relates to the issue presented by the plaintiff's replication to the pleas in abatement, and inasmuch as the pleadings, in part, must be recast, we deem it unprofitable to treat the question of the soundness of the charge as applied to the issues as now framed.

By agreement of the parties entered of record, the issues presented by the defendant's pleas in abatement, and the pleas in bar were tried at the same time and before the same jury, the agreement saving the defendant's right to insist on said pleas in abatement, and no question is raised here in respect to this course of procedure.

One of the defenses asserted by the defendant's special pleas is that the property insured was set fire to and burned through the design or procurement of the plaintiff with intent to defraud the defendant.

While the evidence going to sustain this defense is purely circumstantial, every circumstance in respect to the destruction of the property points to incendiarism. American Ins. Co. of Newark, N. J. v. Fuller, 224 Ala. 387, 140 So. 555.

The evidence is without dispute that plaintiff and his then wife, Mrs. Ila Boatwright, were living in the house in irreconcilable discord; that though he lived in one end of the house and she in the other, he had not spoken to her for months past, and would not allow two of their children, the boys, one seven and the other twelve years of age, to associate or come in contact with their mother; that he had in effect ordered her to leave and go back to her parents; that plaintiff had moved most of his personal effects from the house; that he merely slept in the house at night, coming in late and leaving early.

The evidence further shows that in the late afternoon before the fire plaintiff left Ashville and went to Birmingham, where he remained until after the fire; that he invited one or more persons to accompany him, and finally one H. G. Hood accepted his invitation, and Hood testified that when plaintiff, on his way back to Ashville, was informed of the fire he appeared nervous.

The evidence shows that the discord between plaintiff and his wife resulted in the wife filing a bill for divorce against him, praying for the allowance of alimony pendente lite and counsel's fees, and permanent alimony in the form of a division of the property; that said bill was filed on the 15th day of August, 1933, and on the same day the plaintiff had the insurance on the residence renewed for an increased amount.

The property burned between 7 and 7:30 o'clock p. m. August 22, 1933, and the evidence is without dispute that there had been no fire in the house that day since about 2 o'clock; that Mrs. Boatwright left the house to go to church, taking her little girl ten years of age with her; that when she left the house was unlocked; that the keys to the house customarily were left hanging on a nail, but they had been missing for about a week; that within from fifteen to twenty-five minutes after Mrs. Boatwright reached the church the house was complete enveloped in flames, originating from the inside of the house.

All of Mrs. Boatwright's effects and those of her daughter, other than the clothes that they were wearing were destroyed.

After the fire, the locks that were on the doors were recovered and they were all locked, and the screen door on the back porch was fastened from the inside. About the time the fire was discovered, a person was seen running away from the back of the house going through the pasture in which a cow or an animal of the cow kind was kept. The pasture was surrounded by a barbed wire fence. About the time said person was seen leaving the place of the fire, a car of the same make as the car owned by Russ Boatwright, a brother of plaintiff, passed the house going in the direction said person was running.

On the same lot on which the house covered by the policy was located, prior to the fire, there was another house that had been occupied by the plaintiff and his family before the insured house was built, and during the week immediately before, this building was torn down and moved off by Bill Boatwright, a brother of the plaintiff, as the evidence tends to show, at plaintiff's instance. The only persons, according to a tendency of the evidence, that had access to the house keys, were plaintiff, Mrs. Boatwright, and Bill Boatwright, who had been working around the house during the previous week.

There was also evidence going to show that fumes of gasoline were present at the place of the fire.

Vester Taylor, a brother of Bill Boatwright's wife, testified:

"I never talked with Mr. Marion Boatwright about this house after the fire, not exactly about his house. I talked to him one afternoon along about last September. As to what I said to him and what he said to me, I came in here—well, to commence with, Nellie, my sister, and Bill's wife had a fuss. They came down there one afternoon, and they had a fuss, and Nellie told Willie Lee, 'If you don't go home, I'm going to tell on Bill for burning Marion's house.' I told Marion that he had better get them away from there, that they had had this fuss, and that Nellie had told Willie Lee that she was going to tell on Bill, and that he knew what he was up against, that it was the pen for each one of them, and he said: 'Hell, I will get her this afternoon,' and when I got back home Bill was down there after them. Marion came to see me last Saturday afternoon with Bill Boatwright. Marion drove up in front of the house and blew his horn, and didn't anyone get out. I was sitting on the front porch and my youngest brother also was in it, and he said: 'Come out here,' and I went out there, and it was Bill and Marion, and they said: 'Get in the car, it won't do to sit here,' and I got in and we drove to Cozy Corners about three miles down the road, and he said: 'There was (were) subpoenas issued for you and Nellie and my brother, Bill. And he said: 'What are you going to do about it?' I said: 'I guess I will go,' and he said: 'You stay out of this case and I will see that you don't lose anything.' He said he would notify me when Court adjourned, and he asked me had any insurance men been there. No, sir, he didn't offer me any money, he just told me I wouldn't lose anything. Yes, I told him last September that my sister was going to tell on him and Bill about the fire. Yes, sir, it was that afternoon that he went down and got her; Bill was at home when he got back. Yes, sir, my sister and Bill's wife had had a falling out and my sister had threatened to tell on Bill and Marion. Yes, that was why I told him. Yes, sir, I talked to Bill Boatwright the evening before the fire. They came there about four o'clock that afternoon in Russ' Chevrolet, and Bill had his wife and children with him, and they stayed there a few minutes, and Bill said he was in a hurry, and asked me if I had any liquor, and I told him I had a little, and I went in and gave him two or three drinks and he said he had a job to pull that night— didn't say what it was. So they left about four-thirty and came back towards Ashville. Russ and Bill left at four-thirty, and left his wife and children there, and sometime in the night I heard Bill come in. I think it was about ten o'clock and next morning when we ate breakfast, I don't know whether his shirt was soiled, but his arm had been bleeding, had dry blood on it, and after breakfast when he was washing it off I came by the water shelf, and he said: 'You got any more liquor?' I said: 'Yes,' and he said: 'I'm kinder nervous.' He said: 'I burnt Marion's house last night, and ran into a barbed wire fence, the bull got after me in the pasture.'

"Court: Said what?

"He said he burnt Marion's house last night, and he ran back through the pasture and the bull got after him and he ran into a barbed wire fence. He said he went on down the road about three miles, and Russ picked him up about Bethel Church, and brought him back to the house. Yes, that took place the morning after."

█ Along with the other evidence offered by the defendant, the substance of which has been stated, the defendant offered the original bill filed by the witness, Mrs. Boatwright, against plaintiff for divorce and alimony, and it was admitted in evidence. At the conclusion of the evidence, the court gave at plaintiff's request, written charge 15. This charge invaded the province of the jury. The bill for divorce was properly admitted and was evidence of its filing and existence and the nature of the claim asserted. Richardson v. State, 204 Ala. 124, 85 So. 789; Birmingham Electric Co. v. Wood, 222 Ala. 103, 130 So. 786.

The fact of the existence of said suit for divorce and alimony was competent and material evidence, bearing on the question of motive for the destruction of the property. Hinds v. State, 55 Ala. 145; Barnett v. Farmers' Mut. Fire Ins. Co., 115 Mich. 247, 73 N. W. 372; Great American Ins. Co. v. Dover et al., 221 Ala. 612, 130 So. 335; Cooley v. State, 7 Ala. App. 163, 62 So. 292.

204

The testimony of the witness Vester Taylor, in connection with the other evidence in the case, tended to show a conspiracy to defraud the defendant by willful destruction of the insured property that did not terminate with the burning of the building, but continued through the assertion of the claim and the effort to recover thereon.

■ There is no principle better settled than that the spoliation or an attempt to suppress material evidence by a party to a suit, favorable to an adversary, is a sufficient foundation for an inference that the claim of such party is unjust or fraudulent. McCleery v. McCleery, 200 Ala. 4, 75 So. 316; Dutton v. Gibson, 226 Ala. 657, 148 So. 397; 10 R. C. L. 884, § 32.

■ We are, therefore, of opinion that it was permissible for the defendant to show by the witness Vester Taylor that Bill Boatwright offered witness money to remain away from the trial. The testimony of said witness tended to connect both plaintiff and said Bill Boatwright in a conspiracy to defraud, and to show that said Taylor had been subpœnaed as a witness for defendant.

The other questions argued may not arise on another trial, and for this reason they will not be treated.

For the errors noted, let the judgment be reversed.

Reversed and remanded.

THOMAS, FOSTER, and KNIGHT, JJ., concur.