424 So.2d 596 (1982)
Dr. Charles E. MAY
v.
John A. MOORE, Jr., as Father and Personal Representative of the Infant Child Robert T. Moore, Deceased.
80-671, 80-915.
Supreme Court of Alabama.
December 30, 1982.
*597 James J. Duffy, Jr. and Carroll H. Sullivan of Inge, Twitty, Duffy & Prince, Mobile, and Edward P. Turner, Jr. of Turner, Onderdonk, Bradley & Kimbrough, Chatom, for appellant.
Roscoe B. Hogan and James R. Pratt, III of Hogan, Smith & Alspaugh, Birmingham, and Joseph C. McCorquodale, III of McCorquodale & McCorquodale, Jackson, for appellee.
EMBRY, Justice.
These are consolidated appeals by Dr. Charles E. May. In No. 80-671 he challenges the jury verdict and judgment awarding damages against him, in this medical malpractice action, and in favor of John A. Moore, Jr., as father and personal representative of his infant child, Robert T. Moore, deceased. The suit was for damages for the wrongful death of the infant proximately caused by the negligence of Dr. May in treating the infant during and following its birth.
In No. 80-915 he challenges the imposition of sanctions against him by the trial court for his, his representative's and counsel's failure to comply with the orders of the trial court regarding discovery.
We affirm both judgments.
Fannie Moore, mother of the deceased infant, was admitted to Jackson Hospital in Jackson, Alabama, on 17 October 1977 by Dr. Charles May with a diagnosis of pregnancy, last trimester, premature rupture of the fetal membrane, slight cervical bleeding and false labor. She was treated and released but again returned to that hospital on 25 October 1977 at which time she was *598 readmitted with a diagnosis of premature rupture of the fetal membrane and loss of amniotic fluids. Delivery of her infant did not take place for over 48 hours. Immediately prior to delivery Dr. May checked the mother and informed her the baby would be delivered within the hour or the next hour. However, shortly after he left the room, the mother delivered precipitously in her hospital bed without the assistance of any physician and in less than sterile conditions. After delivery, the child stopped breathing and was resuscitated by the anesthetist on duty. Shortly afterwards a nurse came on duty and received a report from that anesthetist that the child had poor muscle tone, was cyanotic around the mouth and nose, was coughing up frothy white mucus which required frequent suction and the infant was making grunting noises on exhalation. The nurse continued to follow the child and noted a continuing bluish tinge around the mouth, a fast rate of respiration, loud grunting noises on exhalation together with substernal retractions. She notified Dr. May of the infant's condition and continued to observe him. The infant showed signs of respiratory distress from birth and on 30 October cardiac pulmonary resuscitation had to be rendered when the infant ceased breathing and its heart quit beating. At that time the attending nurse on duty asked a licensed practical nurse to reach Dr. May by phone which could not be accomplished. Failing that, the police were called to notify him to come to the nursery. He called at around 3:20 a.m. and spoke with the nurse on duty at which time she requested that he come to the hospital. At about 4:00 a.m. he was again notified by telephone of the critical condition of the infant and was again requested to come to the hospital. Sometime shortly thereafter Dr. May arrived at the hospital; however, the attending nurse testified that she did not see him do anything at all for the baby at that time. During the early morning hours of 30 October, at approximately 8:15 a.m., Dr. May ordered the child transferred to the University of South Alabama. The infant's condition continued to deteriorate with seizures, severe respiratory distress, anemia and body rigidity. On arrival of the transfer team from the neonatal center at the University of South Alabama, the infant was in an incubator and its extremeties appeared stiff. The transfer team did a general assessment of the infant's condition and attempted to stabilize it for the return trip to the medical center.
At approximately 2:00 p.m. on 30 October, the child was transferred to the neonatal care center where, according to Dr. Hollis Wiseman, the pediatrician in charge of that center, the baby was critical if not terminal when it arrived. The diagnosis of Dr. Wiseman was sepsis, a generalized bacterial infection in a newborn infant, and probably meningitis, a part of the bacterial infection disease process. He also was of the opinion that the child had central nervous system injury, secondary either to the infection or to the deprivation of oxygen. The infant died at the University of South Alabama Medical Center the next day at some five days of age. In explaining the child's death, Dr. Wiseman testified that it had developed congenital pneumonia as a result of the long period following rupture of the mother's fetal membranes before delivery. The pediatric pathologist who performed the postmortem on this infant agreed with this conclusion and testified that when the fetal membranes rupture there is an escalating incident rate of infection which, after 48 hours, results in an 80 to 90% probability of infection.
In addition to the very high probability of infection resulting from premature rupture of the fetal membrane, the infant exhibited and developed signs of respiratory infection. In his testimony, Dr. May admitted that symptoms of grunting on exhalation, substernal retraction, increased respiratory rate and cyanosis are indications, or manifestations, of respiratory distress in newborn infants. Dr. Wiseman also testified that these symptoms are cardinal manifestations of respiratory distress in newborn infants. In response to these symptoms Dr. May failed to perform any laboratory tests, other than a blood count. Additionally, despite the fact the child showed indications *599 of infection in the central nervous system, no antibiotics were prescribed, but rather than that being done, Dr. May prescribed caffeine sodium benzoate and decadron, as well as a procedure known as hypodermoclysis.
A Birmingham pediatrician and clinical instructor at the University of Alabama Medical School testified that the treatment rendered the infant by Dr. May was totally inappropriate. He also noted that where 48 hours had lapsed from the rupture of the fetal membranes, birth had occurred under less than sterile conditions, respiratory distress had existed for more than two hours, blood cultures, skin cultures, spinal cultures and other tests should have been obtained and antibiotics started immediately. This doctor also testified that the administration of caffeine sodium benzoate is totally inappropriate care for the stimulation of respiration in the primary care setting, as the Jackson Hospital was, and that hypodermoclysis is an antiquated and dangerous practice and should not have been used.
Not only was Dr. May's failure to do any laboratory testing or to prescribe proper medication improper treatment, another physician in the community of Jackson pointed out the availability of the neonatal center at the University of South Alabama only seventy miles from Jackson, Alabama. He explained the availability of consultation services from which the latest information could be obtained immediately. In the opinion of that doctor, Dr. May violated the standard of care in Clarke County when he failed to transfer the child to the neonatal center, or, in the alternative, to do the proper testing and render the proper treatment there at the Jackson Hospital.
Both the Birmingham pediatrician and clinical instructor as well as Dr. Wiseman of the University of South Alabama neonatal care center, testified that the administration of appropriate treatment would have resulted in a better than 50% chance that the infant would live.
Dr. May urges error to reversal consisting of the following acts occurring in the trial of this case:
(1) that the trial court committed error by charging the jury that the defendant physician was held to a national medical neighborhood standard and
(2) the trial court committed error by permitting a Mobile physician, a Birmingham physician, and a Jackson, Alabama, physician to criticize Dr. May's care and treatment of the infant when neither of them testified that he departed from local community standards, and
(3) that the trial court committed error by denying Dr. May's motion for mistrial, when counsel for plaintiff requalified the jury venire on the subject of Dr. May's insurance carrier, and
(4) that the trial court committed error when it denied Dr. May's motion in limine on the subject of a missing hospital record to include the introduction of evidence concerning the medical care of one Joanna King over repeated objections interposed by defense counsel and
(5) that the trial court committed error and otherwise abused its discretion in imposing sanctions and taxing expenses incurred against Dr. May for plaintiff's resistance to the petition for the writ of mandamus in this court to compel the judge to set aside his order imposing sanctions and taxing the expenses and fees against Dr. May.
We will address the alleged errors in the order presented:
WHETHER THE TRIAL COURT COMMITTED ERROR BY CHARGING THE JURY THAT THE DEFENDANT PHYSICIAN IS HELD TO A NATIONAL MEDICAL NEIGHBORHOOD STANDARD.
Before a detailed discussion of this point is undertaken, it is helpful to set out, verbatim, the trial court's oral instructions on this subject in complete context:
"Under what is known as the Alabama Medical Liability Act the law provides in the pertinent part as follows:
"(A) In performing professional services for a patient, a physician's duty to the patient shall be to exercise such reasonable *600 care, diligence and skill as physicians, in the same general neighborhood, and in the same general line of practice, ordinarily have and exercised in a like case.
"(B) A physician shall not be considered an insurer of the successful issue of treatment or service.
"A physician owes his patient the duty to exercise that care, skill and diligence in the treatment of the patient which physicians in the same general community, and in the same general line of practice ordinarily have and exercised in a similar case, and under like circumstances.
"The language `Same general neighborhood' refers to the national medical neighborhood or national medical community, of reasonably competent physicians acting in the same or similar circumstances.
"Negligence in this case is not to be decided based on what the jury thinks that reasonable men should have done under the circumstances, but negligence in this case is whether or not Doctor May used such reasonable care, diligence, and skill as physicians in this same general line of practice ordinarily have and exercised in a like case.
"Where there are various recognized methods of treatment, the physician is at liberty to follow the recognized method of treatment which he thinks is best, although witnesses have given their opinion that some other method would have been preferable.
"A physician does not guarantee the success of his treatment, and he has fulfilled his duty to a patient if he prescribes a proper treatment, even though it does not produce good results. The word treatment as used in this charge covers all the steps taken to effect a cure of an injury, illness or disease. It includes examination and diagnosis as well as application of remedies."
The defendant physician contends that even if the plurality suggestion in Zills v. Brown, 382 So.2d 528, 532 (Ala.1980), that Alabama should adopt a national standard of care for physicians[1] who perform specialized or professional services, the locality rule would apply to a family practitioner in rural Clarke County such as Dr. May. He contends that to hold otherwise would discourage general practitioners from practicing in rural Alabama and would submit them to the standards of specialists practicing in urban medical centers.
This is specious argument. It ignores the particular facts of, and the evidence in, this case. As countered by Moore, this is not a case in which a rural practitioner (conceding arguendo, that Jackson, Alabama, is a rural community) is criticized for failure to deal with a specialized problem, but, to the contrary, it is simply a woeful failure to diagnose and treat what is apparently a very common problem: respiratory infection in a newborn infant. The evidence shows the newborn was subjected to a very high probability of infection because of the premature rupture of the fetal membranes and manifested classic symptoms of respiratory infection. By his own admission, Dr. May demonstrated that these symptoms indicated respiratory distress in newborns. Confronted with those symptoms, and possessed of that knowledge, he failed to follow through with the necessary laboratory tests to confirm a diagnosis that he failed to make without them and further failed to prescribe antibiotics, the administration of which is common and ordinary in the treatment of that kind of infection.
A family practitioner of Jackson, and chief of staff at Jackson Hospital, testified about the significance of the premature rupture of fetal membranes; the increased incidence of infection when that occurs; reviewed the hospital chart of the infant and pointed to entries evidencing respiratory infection; the required diagnostic tests indicated, and the necessity that antibiotics be *601 employed in treatment. His opinion, based upon his experience as a family practitioner in Jackson, conformed with that of a pediatrician of Mobile, and that of a Birmingham pediatrician and clinical professor of pediatrics. Thus it is clear that Dr. May was not held to the standards of an urban specialist but only to those of a reasonably competent physician acting under the same or similar circumstances. As stated in King v. Williams, 279 S.E.2d 618, 620 (S.C.1981), when abandoning the strict locality rule by adopting the standards of care set out by the Washington Supreme Court in Pederson v. Dumouchel, 72 Wash.2d 73, 431 P.2d 973 (1967):
"... The degree of care which must be observed is of course that of an average, competent practitioner acting in the same or similar circumstances. In other words, local practice within geographic proximity is one, but not the only factor to be considered. No longer is it proper to limit the definition of the standard of care which a medical doctor or dentist must meet solely to the practice or custom or a particular locality, a similar locality, or a geographic area."
It is also worthy of notation, as presented by the evidence, that Dr. May was not isolated from either adequate information or facilities. Aside from the fact that he testified to keeping abreast of current medical thinking through conferences and medical literature, Dr. May had available to him a 24 hour referral service through which any medical practitioner in the state can call a specialist and receive advice or assistance. Additionally, there was available to Dr. May a neonatal center, open 24 hours a day, at the University of South Alabama, which specializes in the treatment of children such as the infant here and is located only 70 miles from Jackson Hospital. A family practitioner in Jackson for 23 years testified that the failure of Dr. May to transfer the child to that neonatal center on the morning of 28 October was a deviation from the accepted standard of care in Clarke County. This court has recognized the effect of available resources on the standard of care in Drs. Lane, Bryant, Eubanks & Dulaney v. Otts, 412 So.2d 254 (Ala.1982) and Zills when it stated:
"... Distinctions in the degree of care and skill to be exercised by physicians in the treatment of patients based upon geography can no longer be justified in light of the presently existing state of transportation, communications and medical education and training which results in a standardization of care within the medical profession. There is no tenable policy reason why a physician should not be required to keep abreast of the advancements in his profession." Zills at 532; Drs. Lane, etc. at 258.
Therefore, the trial court did not err in charging the jury that the defendant physician is held to a national medical neighborhood standard.
WHETHER THE TRIAL COURT COMMITTED ERROR BY PERMITTING A MOBILE PHYSICIAN, A BIRMINGHAM PHYSICIAN, AND A JACKSON, ALABAMA, PHYSICIAN TO CRITICIZE DR. MAY WHEN NONE TESTIFIED THAT HE DEPARTED FROM LOCAL COMMUNITY STANDARDS.
A local doctor from the City of Jackson testified on behalf of the plaintiff in this case. The uncontradicted evidence was that this doctor had been a family practitioner in Jackson, Alabama, for over 23 years; he was board certified in family practice; and during the course of his practice he had delivered some 2000 to 3000 babies. He was also Chief of the Medical Staff at Jackson Hospital when the infant Moore was born. The doctor testified that he was familiar with the facilities available at Jackson Hospital concerning the treatment of babies and was familiar with standard of care exercised by practicing physicians in Clarke County. He testified, that in his opinion, Dr. May deviated from the acceptable medical standard in Clarke County in his treatment of the infant.
"Q. And I believe you have also testified that it is your opinion that the failure to transfer this child in the early morning hours of October 28on October *602 28, 1977, was likewise a departure or deviation from the accepted standard of care in Clarke County, Alabama?
"A. Yes.
"Q. Was the failure by Dr. May to give antibiotics to this child, assuming that he was going to keep the child there and treat it at Jackson Hospital and not transfer it, was the failure to begin prophylactic antibiotics on the morning of October 28th a deviation from the acceptable standard of care in Clarke County, Alabama, at that time?
"A. Yes.
"Q. And the failure to commence these tests, that you have recited to the jury, in the early morning hours of October 28, 1977, is it also your opinion the failure [to] commence those tests, diagnostic tests, to determine the type infection, if any, this child had, provided you are going to keep the child and treat it there in Jackson Hospital, was that likewise a departure or deviation from the accepted standard of care in Clarke County on October 27, 1977?
"A. Yes."
Notwithstanding the Jackson, Alabama doctor's knowledge of the acceptable standard of care in Clarke County, we are inclined to find that the testimony of the Birmingham physician and the Mobile physician was also relevant and admissible. As was pointed out in Zills, the language "same general neighborhood ... refer[s] to the national medical neighborhood or national medical community, of reasonably competent physicians acting in the same or similar circumstances." Zills at 532. As we noted earlier, Dr. May failed to diagnose and treat a very common problem: respiratory infection in a newborn infant. In this case, all doctors who testified about Dr. May's treatment of the infant, had adequate knowledge of the standard of care utilized in the treatment of infants with respiratory distress, so their opinions of the proper treatment were properly received. For these reasons, we find no merit in defendant's argument in this regard.
WHETHER THE TRIAL COURT COMMITTED ERROR BY ALLOWING THE PLAINTIFF TO QUALIFY THE JURY VENIRE ON THE SUBJECT OF DR. MAY'S INSURANCE CARRIER.
Defendant contends the trial court committed prejudicial error when it allowed the plaintiff to ask a second question to the jury venire concerning defendant's liability insurance carrier.
During voir dire of the jury venire on this point the following questions were asked:
(By the trial court)
"Q.... Is any juror an officer, director, employee or policyholder of Mutual Assurance Society of Alabama?"
(Later, by counsel for plaintiff)
"Q. I would like to ask whether any member of the jury panel or anyone in their immediate family are policyholders, officers or employees or in any way have any interest in Mutual Assurance Society of Alabama?"
Although admittedly similar, the question propounded by plaintiff's counsel was somewhat broader than the court's question and encompassed a different inquiry. Plaintiff's inquiry involved a request as to whether any prospective juror or a member of their family had an interest in Mutual Assurance Society of Alabama as opposed to whether the jurors alone had any connection with said company.
This court has reiterated on several occasions that the plaintiff is entitled, upon reasonable and proper motion, to have the jurors qualified as to their relation to, or interest in, any insurance company which would be liable, in whole or in part, for any judgment that might be entered against the defendant. Jones v. Crawford, 361 So.2d 518 (Ala.1978).
We opine that plaintiff's very limited inquiry here was relevant and made in good faith. It is the rule of our cases that the limit of voir dire examination is largely discretionary with the trial court, Calloway v. Lemley, 382 So.2d 540 (Ala.1980), and we do not feel the circumstances here show an abuse of that discretion.

*603 WHETHER THE TRIAL COURT COMMITTED ERROR WHEN IT DENIED DR. MAY'S MOTION IN LIMINE ON THE SUBJECT OF THE MISSING HOSPITAL RECORD TO INCLUDE THE INTRODUCTION OF EVIDENCE CONCERNING THE MEDICAL CARE OF ONE JOANNA KING OVER OBJECTIONS INTERPOSED BY DEFENSE COUNSEL.
Proof may be made concerning a party purposefully and wrongfully destroying a document which he knew was supportive of the interest of his opponent, whether or not an action involving such interest was pending at the time of the destruction. See Gamble, McElroy's Alabama Evidence, § 190.05 (3d ed.1977). Additionally, the spoliation, or attempt to suppress material evidence by a party to a suit, favorable to an adversary, is sufficient foundation for an inference of his guilt or negligence. Southern Home Insurance Co. of the Carolinas v. Boatwright, 231 Ala. 198, 164 So. 102 (1935); see also, Gamble, McElroy's Alabama Evidence, § 190.02 (3d ed.1977).
There was testimony to the effect that failure of Dr. May to properly treat the infant was almost concealed on the occasion of the loss of the child's original chart. One Louise Boykin, the hospital administrator, had made a copy of the chart before it disappeared. She testified she made the copy of the chart because of the disappearance of another child's chart before this, which child had also been a patient of Dr. May. Dr. May's own counsel in questioning Mrs. Boykin brought out the fact that hospital charts of a number of Dr. May's patients had disappeared prior to the treatment of this infant. She further testified that during the time she served as hospital administrator only the charts of Dr. May's patients were missing, not those of other doctors.
At an oral deposition of Dr. May before trial, he produced two copies of the infant's chart, both of which allegedly came from the original copy of Mrs. Boykin's. He testified that one copy was received directly from her and the other from one Foster, who had obtained his copy from Mrs. Boykin. She denied ever giving Dr. May a copy of the record and compared her original copy of the two copies produced by Dr. May. She pointed out the discrepancies from her original copy of those copies produced by Dr. May and thus demonstrated that the copies produced by him could not possibly have come from her original copy.
Admittedly, the evidence adduced by plaintiff was circumstantial in nature; however, a fact may be established by either direct or circumstantial evidence, and the proof is sufficient if, from the facts and circumstances adduced, it can be reasonably inferred. State v. Ludlam, 384 So.2d 1089 (Ala.Civ.App.1980). Furthermore, questions as to the relevancy of testimony are ordinarily within the discretion of the trial court and, unless such discretion has been grossly abused, it will not be considered on appeal. The trial court found the testimony of Mrs. Boykin relevant to the issue of whether Dr. May might have tampered with the original medical chart of the infant Moore in attempting to conceal his guilt or negligence and we see no error in its decision.
Likewise, plaintiff also adduced evidence through testimony of Mrs. Boykin showing Dr. May's connection with the missing records of one Joanna King, another of his patients. The record clearly indicates that the testimony was allowed solely for purposes of impeachment based on the prior denial of Dr. May that he ever had in his possession any part of the original record of Joanna King when in fact Mrs. Boykin produced circumstantial evidence that he did. Such evidence was relevant and was for the jury to make its determination concerning the weight to be given it.
We opine such testimony was limited in nature and was in nowise prejudicial to the defendant.
WHETHER THE TRIAL COURT COMMITTED ERROR AND OTHERWISE ABUSED ITS DISCRETION IN IMPOSING SANCTIONS AND TAXING EXPENSES *604 AND FEES AGAINST DR. MAY FOR HIS FAILURE TO COMPLY WITH THE TRIAL COURT'S ORDERS.
This issue pertains to the second appeal filed by Dr. May. Defendant contends that Rule 37(b)(2), ARCP, does not authorize the imposition of sanctions of the kind and sort enumerated in that order of the trial court entered 2 March 1981. We disagree and affirm.
Prior to trial, and during the course of discovery, it was established that the original hospital records concerning the infant's treatment had disappeared. Fortunately, Louise Boykin, the hospital administrator, made a copy of those records before their disappearance. When it was discovered that counsel for Dr. May had copies of the records differing from Mrs. Boykin's copy, the depositions of Dr. May and his investigator, Wes Foster, were taken to discover the origin of their copies. Both individuals, upon advice of Dr. May's counsel, refused to answer questions concerning the missing records and, therefore, plaintiff filed motions requesting the court to order a response to the questions and the production of Dr. May's file concerning this matter. The trial court granted these motions. The deposition of Wes Foster was rescheduled, at which time, upon advice of Dr. May's counsel, Mr. Foster continued to refuse to answer the questions propounded to him and refused to produce the investigation portion of Dr. May's file concerning the missing hospital records. Plaintiff's counsel suggested to the court that an in camera inspection would be appropriate. In response, counsel for Dr. May refused to allow the trial court to conduct an in camera inspection. On 8 October 1980, the trial court issued an order recognizing that the deponent, Wes Foster, on advice of Dr. May's counsel, had disregarded the court's orders of 17 September and 3 October, and therefore was in contempt of court. On that first date mentioned above the trial court ordered the records to be produced within seven days and indicated that continued refusal to comply with the order would result in sanctions.
Dr. May challenged this order by filing a petition for the writ of mandamus in, and moving this court to stay the trial court's prior discovery orders. This court, on 30 January 1981, denied the petition and dissolved its previously issued stay. Thereafter, Dr. May and his investigator did not produce the requested material within the time allowed by the trial court and upon motion of the plaintiff, that trial court granted sanctions.
Contrary to the position taken by defendant, the order was not directed solely to Wes Foster, but rather was directed to the defendant, his counsel and his representative. The court noted specifically that the failure of Mr. Foster to comply with the court's orders was upon instructions from James J. Duffy, Jr., attorney for defendant, Dr. Charles May.
Therefore, because the deponent did not act on his own or through his individual attorney, but rather as the representative of a party in direct compliance with the directions and instructions of a party's attorney, Rule 37(b)(2) applies. This finding is consistent with the holding in Haney v. Woodward and Lothrop Inc., 330 F.2d 940, 942 (4th Cir.1964) in which the federal court of appeals dealt with the failure of the defendant's insurer, by and through its claim manager, Robert Ford, to produce investigation records pursuant to subpoena. The court in speaking to this factual situation and its relationship to sanctions provided for and in Rule 37 stated:
"We need not distinguish between the Defendants as parties and the insurer and Ford as third persons, for they acted as one and by the same attorney throughout the entire discovery steps."
The federal fourth circuit court of appeals imposed sanctions pursuant to Rule 37, FRCP, which is identical to the Alabama rule.
The defendant also takes the position that sanctions were not appropriate since the defendant eventually complied with the 8 October 1980 order. However, *605 final production is not determinative, but rather the discovery rules permit sanctions when a party fails to obey court orders. State of Ohio v. Arthur Andersen & Co., 570 F.2d 1370 (10th Cir.1978). The ultimate, and reluctant, production of material after the time allowed by order of the court does not absolve the defendant of the charge that he wilfully failed to obey a valid court order. In the circumstances presented, the sanctions imposed by the trial court were just and authorized by the rule.
Lastly, the defendant takes the position that even if sanctions were appropriate, the taxing of expenses and fees resulting from the resistance of the plaintiff to the petition for mandamus were inappropriate sanctions. The federal tenth circuit court of appeals in State of Ohio, supra, was posed a similar question and noted that the plaintiff in order to secure production of the requested documents had to oppose the defendant in both the Court of Appeals and the Supreme Court. That court, as we do here, determined that the awarding of appellate expenses and attorney fees was just and proper under Rule 37(b)(2), FRCP. Specifically, the court took note of the following portion of that rule:
"In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order to pay the reasonable expenses, including attorneys fee, caused by the failure, unless the court finds that the failure is substantially justified or that other circumstances make an award of expenses unjust."
As noted, Alabama's rule is identical to this federal rule. Enforcement of the rule requires sanctions for disobedience of valid court orders. The trial court did not abuse its discretion when it imposed them.
There being no error requiring reversal, the judgment is due to be and is hereby affirmed in both No. 80-671 and No. 80-915.
AFFIRMED.
FAULKNER, JONES, BEATTY and ADAMS, JJ., concur.
MADDOX, ALMON and SHORES, JJ., concur specially.
TORBERT, C.J., not sitting.
MADDOX, Justice (concurring specially).
I still adhere to the views I expressed in Zills v. Brown, 382 So.2d 528, 533 (Ala.1980), on the application of the community standard to be used when a physician's exercise of due care is in issue, but I concur in the result reached in this case.
SHORES, Justice (concurring specially):
I adhere to the views expressed in Drs. Lane, Bryant, Eubanks and Dulaney v. Otts, 412 So.2d 254 (Ala.1982).
ALMON, J., concurs.
NOTES
[1] As indeed it has. Drs. Lane, Bryant, Eubanks & Dulaney v. Otts, 412 So.2d 254, 257, 258 (Ala. 1982).