549 So.2d 23 (1989)
Ex parte Deborah Ann BETTIS, as administratrix of the estate of Gloria Mae Claiborne, deceased.
Ex parte Dr. Dimitri MARSHALL, et al.
(In re Deborah Ann BETTIS, as administratrix of the estate of Gloria Mae Claiborne, deceased v. Dr. Dimitri MARSHALL, et al.)
88-48, 88-123.
Supreme Court of Alabama.
May 26, 1989.
Rehearing Denied July 28, 1989.
Patrick M. Sigler and Stephen C. Moore, Mobile, for petitioner Deborah Ann Bettis.
Walter M. Cook, Jr. of Lyons, Pipes & Cook, Mobile, for Dr. Dimitri Marshall.
Wade B. Perry of Johnstone, Adams, Bailey, Gordon & Harris, Mobile, for Dr. Catherine Ballard.
Bert S. Nettles of Nettles, Barker, Janecky & Copeland, Mobile, for Dr. Bazigha Zahur-Uddin Hasan.
Jay York of Drinkard, Sherling & York, Mobile, for Dr. Walter P. Dickinson and Nareda Hunt, M.D.
Carroll H. Sullivan of Clark, Scott & Sullivan, Mobile, for Dr. Joseph Troncale.
James J. Duffy, Jr. of Inge, Twitty, Duffy, Prince & McKean, Mobile, for Dr. H.C. Mullins.
Broox G. Holmes and Michael E. Upchurch Armbrecht, Jackson, DeMouy, Crowe, Holmes & Reeves, Mobile, for Clifford C. Dasco, M.D.
PER CURIAM.
The petitions for writ of mandamus are denied.
WRITS DENIED.
HORNSBY, C. J., and JONES, ALMON, SHORES, ADAMS and KENNEDY, JJ., concur.
MADDOX, HOUSTON and STEAGALL, JJ., concur in part and dissent in part.
MADDOX, Justice, concurring in part and dissenting in part.
I agree that the petition for writ of mandamus in 88-48 should be denied, but I must dissent from the denial of the petition for writ of mandamus in 88-123.
During the taking of a discovery deposition, plaintiff's counsel discovered a letter written by counsel for defendant doctors to the doctors' insurance carrier concerning "the first draft on the pathology report"; in that letter the defendants' counsel stated that the draft could be damaging to the defendants' case and that they hoped that they would be able to prevent the information "from falling into the plaintiff's attorney's hands."[1]
*24 These two petitions for mandamus were consolidated, and the following legal questions were presented:
1. Did the trial court err in ordering separate trials for two of the doctors?
2. Did the trial court err in granting the motions in limine filed by two of the doctors to exclude counsel's letter from evidence?
3. Did the trial court err in refusing to grant the motions in limine filed on behalf of the other doctors to exclude the letter from evidence?
Plaintiff Deborah Ann Bettis initiated this wrongful death action on behalf of the estate of Gloria Mae Claiborne on March 28, 1986. The suit initially named as defendants Dr. Dimitri[2] Marshall and Dr. Catherine Ballard; later she added as defendants Dr. Bazigha Zahur-Uddin Hasan, Dr. Joseph Troncale, Dr. Walter Perry Dickinson, Dr. Clifford Dasco, and Dr. H. C. Mullins. The plaintiff alleged that Claiborne had been admitted to the University of South Alabama Medical Center following a hypersensitivity reaction to the drug Dilantin and that while a patient, Claiborne received an intravenous "loading dose" of Dilantin that promptly caused her death. The "Final Anatomical Autopsy" on Claiborne stated that her death was caused by "Dilantin Hypersensitivity Presumptive."
In preparation for trial, the plaintiff made requests for the production of documents. At the time these requests were made, all of the defendants were represented by attorneys A. Neil Hudgens and Michael S. McGlothren. The plaintiff also filed a subpoena for production of documents from the Medical Center, where the deceased had been hospitalized.
Numerous discovery motions and other pretrial activity occurred prior to May 24, 1988, when plaintiff's counsel took the deposition of Dr. Albert Coker, an expert witness named by Dr. Dasco. At this deposition, a draft of an autopsy report and what the parties call the "McGlothren letter" were inadvertently produced. The draft of the autopsy report had not been previously produced pursuant to the plaintiff's request for production of documents, and the "draft" report was the one mentioned in the "McGlothren letter." The draft report, among other things, stated that it was "highly likely" that the death of Claiborne had been caused by Dilantin hypersensitivity. The contents of the "McGlothren letter," which was a letter from McGlothren and Hudgens to the defendants' malpractice carrier, Insurance Corporation of America, are set out in footnote 1, and, as the contents of the letter show, the attorneys were aware of the draft report. In fact, the letter referred to the first draft of the autopsy report and the fact that, in the writer's opinion, its language was stronger than that of the final report; the letter also stated that the draft could do damage to the defendants' case and that the attorneys hoped that they would be able to prevent that report from "falling into the Plaintiff's attorneys' hands."
In June 1988, Hudgens and McGlothren withdrew as attorneys for the defendants. In September 1988, the defendants tried to depose several of the plaintiff's experts, but the trial court granted the plaintiff's motion to quash those deposition notices. On September 30, 1988, the trial court entered an order that granted Dr. Hunt and Dr. Dasco's motion in limine concerning the "McGlothren letter" and allowed those two doctors to move for a severance. The trial judge denied the other doctors' motion in limine as to the "McGlothren letter," and ordered that those doctors could not name further expert witnesses, except that if all *25 defendants agreed, then two more expert witnesses would be allowed.
Plaintiff Bettis petitioned this Court for a writ of mandamus, asking us to compel the trial judge to set aside his order in the following particulars:
1. The ruling that Dr. Hunt and Dr. Dasco are entitled to move for a severance and to have a separate trial.
2. The ruling granting the motions in limine filed by Dr. Hunt and Dr. Dasco as to the "McGlothren letter."
3. The ruling allowing the other defendants to name two additional expert witnesses and extending discovery deadlines.
Bettis has also asked this Court to enter a default judgment against the defendants for their intentional conduct in allegedly concealing the draft autopsy report and the "McGlothren letter."
Drs. Marshall, Ballard, Hasan, Hunt, Troncale, Dickinson, and Mullins filed a petition for writ of mandamus with this Court, asking that the trial judge be required to set aside his order in the following particulars:
1. The ruling that denied these defendants' motion in limine as to the "McGlothren letter."
2. The quashing of the defendants' notice of depositions of four of plaintiff's expert witnesses.
3. The ruling that these defendants were limited to only two additional expert witnesses.
Since these petitions were filed, the trial judge, ex mero motu, entered another order that continued the trial date, that abolished all trial-court-set discovery deadlines[3] and limitations, and that, upon resumption of discovery, allows depositions of all witnesses, whether previously deposed or not. This order has rendered moot the doctors' contentions 2 and 3.
We granted the parties' requests for oral argument on only two issues:
(1) Whether the "McGlothren letter" is admissible against some, all, or none of the defendants.
(2) Whether the trial court abused its discretion in ruling that Dr. Hunt and Dr. Dasco are entitled to a severance.
Bettis argued that the "McGlothren letter" is admissible against all of the defendants because, during a major portion of the time that this case has been pending, they were all represented by the two attorneys who wrote the letter. She cited May v. Moore, 424 So.2d 596, 603 (Ala. 1982), wherein this Court said:
"Proof may be made concerning a party purposefully and wrongfully destroying a document which he knew was supportive of the interest of his opponent, whether or not an action involving such interest was pending at the time of the destruction. See Gamble, McElroy's Alabama Evidence, § 190.05 (3d ed. 1977). Additionally, the spoliation, or attempt to suppress material evidence by a party to a suit, favorable to an adversary, is sufficient foundation for an inference of his guilt or negligence."
Bettis contended that since the trial court denied the motions in limine of Drs. Marshall, Ballard, Mullins, Troncale, Dickinson, and Hasan, it should have also denied the motions of Dr. Dasco and Dr. Hunt.
The defendants responded by arguing that May v. Moore is distinguishable because in that case the defendant himself was the one engaged in concealment and in this case it is undisputed that none of the defendants even knew of the draft autopsy report or the "McGlothren letter." Bettis cited Haney v. Woodward & Lothrop, Inc., 330 F.2d 940, 942 (4th Cir.1964) (quoted in May v. Moore, 424 So.2d at 604), wherein the federal court said, "We need not distinguish between the Defendants as parties and the insurer and Ford as third persons, for they acted as one and by the same attorney throughout the entire discovery steps." Bettis argued that the omissions and commissions of an attorney are to be *26 regarded as acts of the client whom he represents. Arkel Land Co. v. Cagle, 445 So.2d 858, 862 (Ala.1983). Basically, Bettis argued that the actions of McGlothren and Hudgens should be imputed to all of the defendants, even without any evidence that the defendants knew about, or authorized, this letter or its concealment, on the theory that the attorneys were acting as agents for the defendants.
The defendants, on the other hand, claimed that the letter should be inadmissible as to all of them for several reasons. While admitting that a client is generally bound by the acts of his attorney, at least in the absence of fraud or collusion, McWilliams v. Martin, 237 Ala. 624, 188 So. 677 (1939), they claimed that if the concealment of the draft report from the plaintiff was sufficient to be fraud, then they should not be held to have authorized it. They argued that an attorney's authority extends only to the doing of lawful acts, and that the mere fact of the client's general retention of the attorney cannot lead to a presumption that the client authorized an illegal act, citing Plant v. Trust Co. of Columbus, 168 Ga. App. 909, 310 S.E.2d 745 (1983); Meacham v. Gjarde, 194 Wash. 526, 78 P.2d 605 (1938). They further argued that the letter contains privileged communications protected by the attorney-client privilege and that the inadvertent disclosure of the letter did not work as a waiver of the right to claim that privilege; that the admission of the letter would inject the issue of insurance into the case; and that the prejudice resulting from the admission of the letter would greatly outweigh any probative value it may have. I agree with the arguments of the defendants.
I am of the opinion that the "McGlothren letter" is not admissible against any of the defendants. The letter is clearly the mental impressions and legal opinions of the attorneys involved, and Rule 26(b)(3), A.R. Civ.P., protects from disclosure "the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." As this Court stated in Ex parte Alabama Power Co., 280 Ala. 586, 592, 196 So.2d 702, 707-08 (1967):
"It makes a difference as to whether the product of the lawyer's work consists of relevant facts, discovered by him and not available to his adversary, upon which he relies to recover, or whether the work product consists of legal theories and contentions upon which he relies to recover upon a given set of facts. The general rule is that claims and contentions need not be answered."
While the draft report may well contain relevant facts,[4] the letter does not; it contains only the legal theories and impressions of the attorneys who wrote it. Many attorneys include in correspondence to their clients comments, impressions, and legal theories that they would not want the other party to know about. I do not know how the "draft report" came into the hands of defense counsel. It apparently was a hospital record, not a record of any of the *27 defendants. Rule 1, A.R.Civ.P., talks about fairness. If defense counsel were under a legal duty to produce the draft report and intentionally suppressed it, that is one thing. If counsel merely had the draft report in their file as part of their "work product," that is quite another thing. Based upon this record, I cannot agree to allow plaintiff to introduce into evidence the work product and mental impressions of defense counsel, which are protected by Rule 26(b)(3).
Further, the only reason Bettis has for wanting to introduce this letter is to present evidence that the defendants "intentionally concealed relevant and incriminating documents from the Plaintiff." In other words, she wants to show that the defendants were guilty of some wrongdoing regarding the draft report; in her brief, she characterizes this concealment as the "intentional wrongdoing of an attorney, acting as an agent of his client." Bettis did not dispute the assertions of the defendants that none of them knew of the draft report's existence and that none of them knew of, or authorized, the "McGlothren letter." Bettis's attorney admitted at oral argument that he had no evidence at all that the defendants knew of, or were involved in, the concealment of the report. In fact, none of the defendants ever had the draft report. Assuming, however, that the attorneys concealed the report and that the concealment was wrongful, then the letter would not be admissible against the defendants, because a client is not bound by the acts of his attorney if fraud or collusion is present. McWilliams, 237 Ala. at 625, 188 So. at 678.
For these reasons, I would hold that the trial court correctly granted the motions in limine as to Drs. Hunt and Dasco, but that the trial court erred in not granting the motions in limine as to the other doctors regarding the "McGlothren letter."
HOUSTON and STEAGALL, JJ., concur.
NOTES
[1] The full text of the letter written by attorneys A. Neil Hudgens and Michael S. McGlothren to Stephen Richards and Lee A. Gross, Insurance Corporation of America, defendants' insurer, is as follows:

"Gentlemen:
"Please find enclosed a copy of the first draft on the pathology report prepared by Dr. Atwell. If the plaintiff's attorney is able to obtain a copy of this draft, some damage will be done to our defense. As you can see, the first draft was much stronger in terms of its position on the role of Dilantin in this case.
"Hopefully, we will be able to prevent this information from falling into the plaintiff's attorney's hands. However, it may be that this draft is discoverable in which case we will simply have to attempt to `work around it'."
[2] The plaintiff spells this doctor's first name as "Dimitri," while the other parties spell it as "Demetri".
[3] Pending the decision of this Court on the petitions for mandamus, this Court stayed all discovery proceedings in the trial court.
[4] The issue of the draft autopsy report's admissibility is not before this Court. However, there is some question of whether Bettis properly requested this document; her request for production of documents submitted to the defendants asked for "all documents and materials regarding medical care and treatment of Gloria Mae Claiborne." The request is for documents involving Claiborne's treatment, not for documents related to her autopsy or any other event occurring after her death.

Bettis makes a great deal out of the fact that the draft report stated that death by Dilantin was listed as "highly likely" as opposed to "presumptive" in the final report. I do not see how the phrase "highly likely" is stronger than the term "presumptive." To "presume" is defined as "to accept as true or credible without proof." Webster's Third New International Dictionary, 1796 (1976). How accepting something as true without proof is not as strong as saying that that something is highly likely is not clear to me.
As an analogy to the difference between the draft report and the final version, I judicially know that before an opinion is released by this Court, it often goes through a number of drafts; some can contain language totally different from the final version, even if the same Justice has written the drafts and the final opinion. The draft autopsy report in this case was prepared by the resident pathologist, while the final report was prepared by the pathologist; it may be that the change in terminology was nothing more than a stylistic change. I cannot share the apparent feeling of counsel for Bettis that defense counsel was guilty of fraud and concealment. As the "McGlothren letter" points out, there could be a colorable question whether a "draft report" is discoverable.