DONALDSON, Judge.
The Montgomery Circuit Court entered a judgment affirming a decision by the State Health Planning and. Development Agency (“SHPDA”) to allow RegionalCare Hospital Partners, Inc., and RCHP-FIor-erice, LLC, d/b/a North Alabama Medical Center (hereinafter referred to collectively as “RegionalCare”) to relocate a hospital in Florence. For the reasons explained below, we affirm the judgment of the circuit court.

Facts and Procedural History

The following facts are contained in the record. Eliza Coffee Memorial Hospital (“ECMH”) is a general, acute-care hospital located in Florence that has been in existence since 1919. ECMH’s existing facility, which was constructed in the early 1940s, is licensed by SHPDA for 358 beds. In 2010; RegionalCare purchased ECMH from the Health Care Authority of Laud-erdale County and the City of Florence (“the Health Care Authority”). As part of the agreement with the Health Care Authority, RegionalCare agreed to construct a new hospital facility containing at least 300 beds to replace the existing ECMH facility. On December 30, 2011, Regional-Care filed an application with SHPDA seeking a certificate of need (“CON”) for the construction of a 300-bed replacement hospital for ECMH in Florence, which would be licensed and operated as RCHP-Florence, LLC, d/b/a North Alabama Medical Center (“NAMC”). See § 22-21-265, Ala.Code 1975 (requiring a CON from SHPDA for new institutional health-care facilities). In the application, Regional-Care proposed that 280 of the 300 requested beds would serve as acute-care beds, with the 20 additional beds serving as psychiatric-care beds. RegionalCare also proposed in the application that NAMC would transform itself into a regional hospital by 2018. ECMH had served as a community hospital. On January 17, 2012, Regional-Care amended, its application to include information regarding the square footage of the proposed facility, construction costs, and the physical location of the proposed facility. RegionalCare’s application was prepared by Noel Falls, who served as RegionalCare’s health-care expert witness at the subsequent administrative hearing concerning the need for the 300-bed CON.
In March 2012, Colbert County Northwest Alabama Health Care Authority d/b/a Helen Keller Hospital (“Helen Keller”) and other health-care facilities in north Alabama' filed notices of intervention before SHPDA in opposition to Regional-Care’s CON application. On March 11, 2012, RegionalCare filed a “Contested Case Request” asking for the appointment of an ádministrative-law judge (“ALJ”) pursuant to- § 22-21-275(6), Ala.Code 1975, and Rules 410-1-8-.01 and-.02, Ala. Admin. Code (SHPDA). SHPDA appointed an ALJ to conduct the contested-case hearing. Between February 4, 2013, and February 19, 2013, the ALJ' conducted a 12-day hearing at which 46 witnesses testified and 160 exhibits were introduced into evidence.
On May 30, 2013,. the ALJ issued a recommendation that SHPDA grant Re- *951 gionalCare a CON permitting it to construct the replacement hospital for ECMH as requested. The ALJ determined that ECMH’s current facility was outdated, that it was in need of replacement, that the location of ECMH’s current facilityVas no longer feasible, that renovating and/or replacing ECMH’s current facility at its existing location was not practical, that the replacement project would be financially feasible, and that the location for the proposed NAMC facility is more appropriate and accessible than the location of ECMH’s current facility. Helen Keller does not contest those findings and concedes that ECMH’s current facility is in need of replacement.
The ALJ, however, declined to recommend that SHPDA grant a CON for the requested 300 beds. The ALJ determined that Falls’s testimony regarding his analysis of community need for a 300-bed hospital was not based on credible evidence or reliable data. The ALJ concluded that the 300-bed figure requested in the CON. application “was not the result of any sort of needs analysis.” The ALJ stated that Falls’s conclusion “that [ECMH] can successfully metamorphose from a community hospital into a regional hospital rests on insufficient data.” The ALJ further concluded that Falls’s testimony that the 300-bed hospital would not have an adverse effect on Helen Keller was not based on sufficiently reliable facts and data. The ALJ found that Falls’s “conclusions regarding patient referral and migration patterns ... lack a scientific foundation,” that Falls’s “conclusions are not based on sufficient or reliable data and were not derived through application .of a reliable methodology,” and that, “[i]nstead, Mr. Falls says he Vas left at the point of making a reasonable and. appropriate judgment about what may happen.’ ”
An administrative rule adopted as part of the State Health Plan, Rule 410-2-4-,14(3)(b), Ala. Admin. Code (SHPDA), provides as follows:
“For replacement of hospitals, the occupancy rate for the most recent annual reporting period should have been at least 60 percent. If this occupancy level was not met, the hospital should agree tó a reduction in bed capacity that will increase its occupancy rate to 60 percent. For example, if a 90-bed hospital had an average daily census (ADC) of 46 patients, its occupancy rate was 50 percent. (The ADC of 45 patients divided by 90 beds equals 50 percent). To determine a new bed capacity that would increase the hospital’s occupancy rate to 60 percent, simply divide the ADC of 45 patients by- .60 (A- fraction of a bed should be rounded upward to the next whole bed) The hospital’s new capacity should be 75 beds, a 15 bed reduction to its original capacity of 90 beds.”
We will refer to this rule as the “60% occupancy rule.” The ALJ determined that, applying the 60% occupancy rule, the number of beds for the new hospital should be limited to 233 based on the occupancy levels stated in ECMH’s 2010 annual report, the most recent and applicable annual report. : As the ALJ explained in its recommendation, ■
“[a]verage daily census is calculated by dividing the number of patient days in a particular-service category by the number of operational days in a year, which is normally 365. Ala. Admin. Code r. 410-2-4-.02(e).... [ECMH] had 47,092 acute care patient days in 2010, 46,622 in 2011,• and 48,088 in 2012. Applying SHPDA’s methodology, [ECMH] ’s average daily census was 129.02 in 2010, 127.73 in 2011, and 131.75 in 2012. Applying the Sixty Percent Rule found, in Ala. Admin. Code r. 410-2-4-.14[3](b) *952 yields the following replacement hospital bed numbers; 215 for 2010, 213 for 2011, and 220 for 2012.
“For psychiatric beds, the calculation is performed in a similar fashion, and yields the following replacement hospital bed numbers: 18 for 2010, 16 for 2011, and 14 for 2012.
“... The most recent annual report at the time the Application was filed was the 2010 Annual Report. According to the Sixty Percent Rule, therefore, the replacement hospital proposed by [Re-gionalCare] should be limited to 233 beds based on the 2010 average daily census.”
(Citations omitted.)
The ALJ determined that RegionalCare “has not demonstrated a need that would justify exceeding the number of beds pursuant to the [60% occupancy rule].... ” The ALJ stated:
“Although [RegionalCare] has demonstrated that [ECMH] is outdated, it has not demonstrated a need that would justify exceeding the number of beds mandated by the Sixty Percent Rule, assuming for the sake of argument that any facts would justify such a departure.... [T]here is no evidence of any community need that would warrant building beds in excess of the number mandated by the State Health Plan.”
On June 6, 2013, RegionalCare and Helen Keller filed exceptions with SHPDA to the ALJ’s recommended order. On June 19, 2013, the SHPDA’s CON Review Board (“the CONRB”) held a hearing on the matter at which it received the arguments of the parties and received testimony of various witnesses.[1] At the conclusion of the hearing, the CONRB voted to adopt the findings and recommendations of the ALJ, except that the CONRB voted to reject the ALJ’s 233-bed recommendation and, instead, to issue a CON to Regional-Care for a total of 280 beds (263 acute-care beds and 17 psychiatric-care beds). Accordingly, on July 5, 2013, the CONRB issued the following order awarding the CON:
“After deliberation, [the CONRB] rejected the ALJ’s recommendation as to the number of beds, and instead approved a reduction in authorized beds from 300 (as requested) to 280 beds, which shall be comprised of 263 acute care beds and 17 psychiatric beds. In so doing [the CONRB] found that there was sufficient justification in this case to approve a larger number of beds than would result from strict application of the 60 percent guideline under Ala. Admin. Code r. 410-2-4-.14(3)(b).”
Pursuant to the version of § 22-21-275(6), Ala.Code 1975, in effect at the time RegionalCare filed its CON application, Helen Keller filed a notice of appeal to the circuit court on July 11, 2013.[2] The circuit *953 court held a hearing' on May 2, 2014. On June 3, 2014, the circuit court "entered an order affirming' the decision of the CONRB, stating that, “[ujnder Code § 22-21-275 and Ala. Admin. Code § 410-1-8-.05(2), SHPDA’s CON Review Board had the authority to increase the number of beds awarded for the replacement hospital from the ALJ’s recommendation of 233 beds to 280 beds, as stated in the CON Review Board’s final decision.” Helen Keller filed a notice of appeal to this court oh July 10, 2014.

Standards of Review

“This court reviews a circuit court’s judgment as to an agency’s decision without a presumption of correctness because the circuit court is in no better position to review the agency’s decision than is this court.” Brookwood Health Servs., Inc. v. Affinity Hosp., LLC, 101 So.3d 1221, 1225 (Ala.Civ.App.2012) (citing Clark v. Fancher, 662 So.2d 258, 261 (Ala.Civ.App.1994)). Section 41-22-20(k), Ala.Code 1975, a part of the Alabama Administrative Procedure Act (“the AAPA”), § 41-22-1 et seq., Ala. Code 1975, provides the scope of judicial review of an order issued by SHPDA awarding a CON:
“Except where judicial review is by trial de novo, the agency order shall be taken as prima facie just and reasonable and the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact, except where otherwise authorized by statute. The court may affirm the agency action or remand the case to the agency for taking additional testimony and evidence or for further proceedings. The court may reverse or modify the decision or'grant other appropriate relief from the agency action, equitable or legal, including declaratory relief, if the court finds that the agency action is- due to be set aside or modified under standards set forth in appeal or review statutes applicable to that agency or if substantial .rights of the petitioner have been prejudiced because the agency action is any one or more of the following:
“(1) In violation of constitutional or statutory provisions;
. “(2) In excess of the statutory authqrity of the agency; -
“(3) In violation of any pertinent agency rule;
“(4) Made upon unlawful procedure;
“(5) Affected by other error of law; .
“(6) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
“(7) Unreasonable, arbitrary, or capricious, or characterized by an abuse of discretion or a clearly unwarranted exercise of discretion.” ■
In Kyser v. Harrison, our supreme court stated:
“The standard of review applicable to whether an expert should be permitted to testify is well settled. The matter is ‘largely discretionary with the trial court, and that court’s judgment will not be disturbed absent an abuse of discretion.’ Hannah v. Gregg, Bland & Berry, Inc., 840 So.2d 839, 850 (Ala.2002). We now refer to that standard as a trial court’s ‘exceeding its discretion.’ See, e.g., Vesta Fire Ins. Corp. v. Milam & Co. Constr., Inc., 901 So.2d 84, 106 (Ala.2004) (‘Oür review of the record supports the conclusion that the trial court *954 did not exceed its discretion in finding that Jones was properly qualified as an expert under Rule 702[, Ala. R. Evid.,] and in considering his testimony.’). However, the standard itself has not changed.”
908 So.2d 914, 918 (Ala.2005).
“When evidentiary rulings' of thé trial court are reviewed on appeal, ‘rulings on the admissibility of evidence are within the sound discretion of the trial judge and will not be disturbed on appeal absent an abuse of thát discretion.’ ” Bowers v. Wal-Mart Stores, Inc., 827 So.2d 63, 71 (Ala.2001) (quoting Bama’s Best Party Sales, Inc. v. Tupperware, U.S., Inc., 723 So.2d 29, 32 (Ala.1998), citing in turn Preferred Risk Mut. Ins. Co. v. Ryan, 589 So.2d 165 (Ala.1991)).

Discussion

I. Issuance of the CON
We first address Helen Keller’s contention that the CONRB acted arbitrarily and capriciously in granting RegionalCare a 280-bed CON and that the decision should be reversed pursuant to § 41-22-20(k)(7). Helen Keller argues that the CONRB failed to apply the 60% occupancy rule to this case in a manner consistent with 'its application in other cases that have been before the CONRB.
In Brookwood Health Services, Inc. v. Baptist Health System, Inc., 936 So.2d 529, 537-38 (Ala.Civ.App.2005), this court held that
, “[w]hether to grant a requested CON in one case and to deny a requested CON in another, allegedly similar, case falls squarely within the discretion of the CONRB, as our holding in State Health Planning Agency v. Mobile Infirmary Ass’n, 608. So.2d 1372 (Ala.Civ.App.1992), demonstrates:
"j.,, The [State.Health Elan] guidelines are merely a set of criteria used in processing applications and [the State Health Planning Agency] is' entitled to exercise its discretion in following- these guidelines.... Neither this court nor the circuit court may substitute its judgment for that of the administrative agency.’
“608 So.2d at 1374-75.”
Furthermore,
“[t]his court and our supreme court have recognized the need for consistency in administrative decisions. See, e.g., Continental Tel. Co. of the South v. Alabama Pub. Serv. Comm’n, 479 So.2d 1195, 1213 (Ala.1985); Mobile County Gas Dist. v. Mobile Gas Serv. Corp., 284 Ala. 664, 670-71, 227 So.2d 565, 570-71 (1969); and Brookwood Health Serv., Inc. v. Baptist Health Sys., Inc., 936 So.2d 529, 536 (Ala.Civ.App.2005). However, our courts have also made clear that the doctrine of stare decisis ‘does not apply to administrative decisions.’ Brookwood Health Serv., 936 So.2d at 536; see also Mobile County Gas Dist., 284 Ala. at 671, 227 So.2d at 571. In determining whether decisions of an administrative agency impermissi-bly conflict, our supreme court has stated: ‘Because there is need -for flexibility in administrative decisionmaking, .the doctrine of stare decisis generally does not bind administrative agencies to their prior decisions. Thus, when inconsistent determinations are made by an administrative agency, the issue is whether the agency has acted in an arbitrary and capricious manner.’ Ex parte Shelby Med. Ctr., Inc., 564 So.2d 63, 68 (Ala.1990).. Accordingly, although there is a need for consistency in administrative decisions, ‘where the circumstances are the same in all material respects,’ Mobile County Gas Dist., 284 Ala. at 671, 227 So.2d at 571, the doctrine of stare decisis generally will not apply to an *955 ALJ’s decision under § 36-26-115[, Ala. Code 1975].”
South Alabama Skills Training Consortium v. Ford, 997 So.2d 309, 333-34 (Ala.Civ.App.2008).
Helen Keller contends that the CONRB applied the 60% occupancy rule in a manner that is inconsistent with its order issued in Affinity Hospital, LLC v. St. Vincent’s Health System, 129 So.3d 1022 (Ala.Civ.App.2012), in which the CONRB required the CON applicant to reduce the requested number of beds to comply with that rule. In Affinity, Affinity Hospital, LLC, d/b/a Trinity Medical Center of Birmingham (“Trinity”) applied with SHPDA for a CON to relocate its hospital from its existing campus to a vacant hospital building located on Highway 280 in Birmingham. In its application, Trinity sought to relocate 398 of its 560 beds to the new facility. SHPDA determined that Trinity’s application did not meet the 60% occupancy rule, but it awarded Trinity the CON subject to the stipulation that the number of acute-care beds be further reduced by 26 beds in order to meet the 60% occupancy rule. Id. at 1026-27. On appeal,'the circuit court determined that the number of proposed beds could not be reduced unless Trinity withdrew its application and submitted another application to SHPDA requesting the lower number. Id. Concerning the 60% occupancy rule, this court stated that
“parties may disagree on a hospital’s average daily census, the number that will determine how many beds a hospital may move in cases like this one. In such eases, the ALJ must determine the average daily census to determine how many beds may be moved under the rule. After such a determination is made, the number of requested beds should be reduced to meet the 60% occupancy standard, if necessary. ‘ “This court and the [circuit] court must give substantial deference to an agency’s interpretation of its rules and ’regulations. ‘[A]n agency’s interpretation of its own regulation must stand if it is reasonable-, even though it may not appear as reasonable as some other interpretation.’ ” ’ Fowler v. Johnson, 961 So.2d 122, 130 (Ala.2006) (quoting Mobile Cnty. Pers. Bd. v. Tillman, 751 So.2d 517, 518 (Ala.Civ.App.1999)). SHPDA’s application of the 60% occupancy rule in this case is reasonable. The circuit court’s rigid interpretation of the rule would hamstring' SHPDA’s ability to permit the relocation of hospitals. Under that interpretation, if the proposed number- of beds to be moved is determined to be evén one number too high the applicant would have to abandon the application and start the process again after the ev-identiary hearing. Such a draconian approach would undermine our legislature’s stated need for ‘efficient, economical and effective government administration’ in administrative procedures. § 41-22-2(b), Ala. Code 1975.”
129 So.3d at 1028.
The question in Affinity, however, differs from the question presented in this case. In Affinity, the issue was whether Trinity was compelled to re-file a CON application after the requested bed amount was determined to exceed the 60% occupancy rule, in this case, the issues are whether the CONRB had before it sufficient evidence to support its decision to issue the 280-bed CON and whether the CONRB’s treatment of the 60% occupancy rule in this case is subject to judicial reversal.
We note that evidence submitted to the ALJ at the administrative hearing indi-' cates that.the CONRB-has historically treated the 60% occupancy rule as a guideline. As part of its extensive findings and recommendations, the ALJ summarized *956 the evidence presented at the administrative hearing concerning the CONRB’s treatment of the 60% occupancy rule when CON applications for replacement hospitals were granted allowing for beds in excess of what would be the appropriate bed number under the 60% occupancy rule. The ALJ stated:
“With respect to the provision in § 410-2-4-.14(3)(b) concerning occupancy rate, Mr. Noel Falls testified that this provision is not mandatory and the CON Review Board on prior occasions has applied this provision as ‘a permissive guideline or as a discretionary clause’ and not a mandatory requirement. Mr. Falls cited, for example, Choctaw General Hospital, which the CON Review Board approved for a replacement, even though the hospital had been closed since 1993 and thus had no utilization to which the CON Review Board could apply the 60% occupancy guideline. St. Vincent’s/St. Clair was approved for a 40-bed replacement hospital. Mr. Falls testified, ‘It had an average daily census that, if the 60 percent calculation had been applied as a mandatory provision, would have allowed the Board to approve them for 26 beds. They were approved for 40 beds.’
“Mr. Falls cited other examples of hospitals which did not meet the 60% guideline but nevertheless were approved by the CON Review Board for replacement. For example, Lawrence Medical Center was approved in 2006 for a 43-bed hospital, ‘Their average daily census, if it had been applied as a mandatory requirement, would' have allowed them to have 31 beds.’ Mr. Falls testified that the 60% calculation in the first Trinity Medical Center replacement project was 398 beds yet the CON Review Board ‘approved it for 424 beds.’ In the second Trinity Medical Center replacement hospital hearing, Trinity ‘requested 398 beds, but that included 26 skilled nursing facility beds in the facility. Those were backed out, and it was approved for 372.’
“Finally, Mr. Falls cited Phenix Regional Hospital’s replacement facility, which had been closed for a year before the filing of a replacement application, ‘[t]hey filed a replacement application for 70 beds that had been closed for a year and [the CON Review Board] approved it.’ ”
Thus, the evidence established that, in pri- or cases, the CONRB has not strictly applied the 60% occupancy rule as mandating a maximum number of beds but, instead, has treated it as a nonmandatory guideline for consideration.
This court has recognized that a state agency’s “interpretation of the regulations and statutes it is charged with enforcing should be given great weight and deference by this court unless,that interpretation is contrary to the plain wording of the statute or regulation.” Yelverton’s, Inc. v., Jefferson Cnty., 742 So.2d 1216, 1221 (Ala.Civ.App.1997)(citing Farmer v. Hypo Holdings, Inc., 675 So.2d 387, 390 (Ala.1996)). We have also held that “ ‘ “[^language used in an administrative regulation should be given its natural, plain, ordinary, and commonly understood meaning, just as language in a statute.” ’ ” Columbiana Health & Rehab., LLC v. Statewide Health Coordinating Council, 138 So.3d 305, 309 (Ala.Civ.App.2013) (quoting Ex parte Wilbanks Health Care Servs., Inc., 986 So.2d 422, 427 (Ala.2007), quoting in turn Alabama Medicaid Agency v. Beverly Enters., 521 So.2d 1329, 1332 (Ala.Civ.App.1987)). The 60% occupancy rule provides that a hospital should agree to a reduction in bed capacity of a replacement hospital when 60% of the existing occupancy level has not -been met. In promulgating Rule 410-2-4-.14(3)(b), *957 SHPDA opted to include the suggestive word “should,” instead of the mandatory word “shall.” See Ex parte Prudential Ins. Co. of Am., 721 So.2d 1135, 1138 (Ala.1998)(“The word ‘shall’ is clear and unambiguous and is imperative and mandatory.”). See also Lambert v. Austin Indus., 544 F.3d 1192, 1196-97 (11th Cir.2008)(interpreting the word “should” to be permissive and not mandatory). Therefore, the 60% occupancy rule does not mandate strict application of the formula contained within it if the CONRB determines that it is reasonable not to strictly apply the rule based on its evaluation of the evidence presented.
Helen Keller also contends that the CONRB’s decision to grant the 280-bed CON to RegionalCare was arbitrary and capricious because, it says, the final order of the CONRB is inconsistent with the ALJ’s recommended order. Helen Keller argues that the ALJ’s findings of fact and conclusions of law, which were adopted by the CONRB with the exception of the number of beds to be approved, directly contradict the CONRB’s determination to grant the 280-bed CON. Helen Keller contends that the ALJ found that the evidence failed to establish a need for a hospital larger than 233 beds and that, therefore, the 280 beds approved by the CONRB was a compromise figure.
We have previously held that the CONRB is not bound to accept the recommendation of an ALJ. In Colonial Management Group, L.P. v. State Health Planning and Development Agency, 853 So.2d 972, 974-77 (Ala.Civ.App.2002), this court stated:
“[SHPDA Reg. 410-1-8-.02] provides that, following the contested-case hearing, the ALJ must make a recommendation to the CONRB to approve or deny the CON application. Pursuant to SHPDA Reg. 410-1-8-.05, the CONRB must accept or reject ALJ’s recommendation by a majority vote. In his dissent in Forest Manor, Inc., Judge Crawley properly stated that ‘the ALJ’s recommendation is not a binding order on the parties, and the SHPDA regulations do not require that the CONRB give any deference to an ALJ’s recommendation. See SHPDA Reg. 410-1-8-.05.’ Forest Manor, Inc. v. State Health Planning & Dev. Agency, 723 So.2d [75,] 82 [(Ala.Civ.App.1998)] (Crawley, J., dissenting, joined by Thompson, J.). As in this case, many CONRB decisions involve an analysis of statistical and demographic data that is unaffected by an assessment of witness credibility and demean- or. However, we would note that there is merit to the notion that when an ALJ has conducted an ore tenus proceeding and is the only administrative official to have had the opportunity to observe the witnesses and evaluate their credibility and demeanor, there should be ‘at least some degree of deference to the hearing officer’s findings when conflicting testimony and demean- or evidence are involved.’ See Personnel Board v. King, 456 So.2d 80, 82 (Ala.Civ.App.1984). Thus, where there is substantial evidence, other than a witness’s ore tenus testimony and demeanor, that is probative of the witness’s credibility or lack thereof, that evidence may be considered by the CONRB and the CONRB is free to rule consistently with such other evidence. However, we would note that when the only substantial evidence as to the credibility of a witness is the witness’s own testimony and demeanor at an ore tenus proceeding conducted by an ALJ, a CONRB that has not seen or heard the witness testify would have no basis, other than the ALJ’s findings, upon which to assess the cred *958 ibility of the witness. Thus, where the credibility or lack of credibility of the witness is material to the outcome of a contested case, the fact that the only available evaluation of the witness’s credibility comes from the ALJ’s proposed findings - should have to be' considered in evaluating whether the CONRB’s ultimate decision is supported by substantial evidence.
“... [I]n a case such as this where the CONRB’s order is the final decision of SHPDA, the CONRB’s order is entitled to a presumption of correctness on appeal. Thus, this court’s review of the CONRB’s decision is deferential. This court, in considering the other evidentia-ry issues raised on appeal, will not reverse the CONRB’s order unless it is arbitrary, capricious, or not in compliance with applicable law. See § 22-21-275(6) and (12), Ala.Code 1975; Alabama Renal Stone Inst., Inc. v. Statewide Health Coordinating Council, [628 So.2d 821 (Ala.Civ.App.1993)
In its findings and recommendations, the ALJ determined that Falls’s testimony concerning the need for a 300-bed CON was not reliable; thus, the ALJ recommended that the evidence supported the issuance of a 233-bed CON pursuant to the 60% occupancy rule. The CONRB adopted, in whole, the ALJ’s findings and recommendations, with the ■ exception that it reduced the 300 beds requested in the CON application to 280 beds. Thus, the CONRB can be said to have recognized and applied the ALJ’s determination that Falls’s testimony concerning the need for a 300-bed CON- was not reliable. However, the CONRB could also have determined from substantial evidence in the record that Falls’s testimony, along with the other voluminous materials and witness testimony in support of the CON application, supported the issuance of a 280-bed CON.. The CONRB had before it evidence indicating that ECMH had a CON for 358 beds and that it currently staffs 278 beds due to the condition and the layout of its existing facility. It further had before it evidence regarding historical occupancy data of ECMH. The ALJ noted in its order that, “[i]n this case, the evidence showed that [ECMH’s] occupancy rate has been historically much higher. In 2006 the average daily census was 188 and in 2007 it was 184. In 2008 the 184 average daily census was only slightly lower at 176.8. These figures support a 300 bed replacement hospital even under the 60% occupancy guideline.” The evidence established that ECMH’s occupancy had been negatively impacted by the economy and by ECMH’s inability to renovate its existing facility. Furthermore, the CONRB had before it evidence of the closure of acuté-care beds at neighboring Florence Hospital, which eliminated 100 licensed beds in Lauderdale County. The evidence indicated that there was an anticipated increase in the older population in the, area and an increased demand for services under the Patient Protection and Affordable Care Act of 2010, Pub.L. No. 111-148, 124 Stat. 119 (2010). Therefore, the CONRB had an articulable, reasonable basis upon which to permit, RegionalCare to exceed the number of beds required by application of the 60% occupancy rule, and it had substantial- evidence before it to support granting RegionalCare the 280-bed CON. Based on our deferential standard of review, we affirm the circuit court’s determination to uphold the CONRB’s granting of the CON.
II. Evidentiary Issues
A. Spoliation of Evidence
Helen Keller next contends that Falls’s testimony was due to be disregarded or excluded as a sanction for his failure *959 to preserve his underlying work product. Helen Keller argues that Falls purportedly performed a series of calculations to determine the appropriate size of the proposed NAMC facility and to establish the projected service area for NAMC. Falls, however, testified that he destroyed those calculations after he completed the CON application. At the. administrative hearing, Helen Keller made a motion to exclude Falls’s testimony on this basis, but the ALJ denied the motion, Helen Keller contends that Falls’s failure to preserve his calculations on spreadsheets and tables amounts to spoliation of evidence. Helen Keller argues that, “without the calculations, Helen Keller Hospital is at an extreme disadvantage in defending against [RegionalCare’s] claimed need for a replacement hospital” and that Falls’s failure to preserve his work product “prohibits Helen Keller Hospital from double-checking Falls’s work to ensure: that he used the proper formulas and equations and that the formulas and equations were carried out without error.” Helen Keller’s brief at 3.
“Spoliation is an attempt by a party to suppress or destroy material evidence favorable to the party’s adversary. May v. Moore, 424 So.2d 596, 603 (Ala.1982). Proof of spoliation will support an inference of guilt or negligence. May, 424 So.2d at 603. One can prove spoliation by showing that a party purposefully or wrongfully destroyed a document that the party knew supported the interest of the party’s opponent. Id.”
Wal-Mart Stores, Inc. v. Goodman, 789 So.2d 166, 176 (Ala.2000). “[Our supreme court] has applied five factors in analyzing a spoliation-of-the-evidence issue: (1) the importance of the evidence destroyed; (2) the culpability of the offending party; (3) fundamental fairness; (4) alternative sources of the information obtainable from the evidence destroyed; and (5) the possible effectiveness of other sanctions less severe than dismissal.” Story v. RAJ Props., Inc., 909 So.2d 797, 802-03 (Ala.2005) (citing Vesta Fire Ins. Corp. v. Milam & Co. Constr., Inc., 901 So.2d 84, 94-95 (Ala.2004)).
We conclude that the second factor — the culpability of the offending party — is determinative as to this issue. In Story, our supreme court held that, “[i]n a case of classic, spoliation, ‘the offending party “purposefully” and “wrongfully” destroyed evidence “he knew was supportive of the interest,of his opponent.””’ Story, 909 So.2d at 804 (quoting Vesta Fire, 901 So.2d at 96, quoting in turn May v. Moore, 424 So.2d 596, 603 (Ala.1982), and citing Alabama Power Co. v. Murray, 751 So.2d 494, 497 (Ala.1999)). Helen Keller does not argue that Falls knew that his calculations were supportive of Helen Keller’s interest. Furthermore, there is no indication from the record that the calculations Falls destroyed would have been favorable to Helen Keller. We, therefore, cannot conclude that Falls’s testimony was due to be disregarded on the basis of spoliation of the evidence. - ■
B. Application of Rule 702(b), Ala. R. Evid.
Helen Keller also contends that Falls was not qualified to provide testimony as an expert witness under Rule'702(b), Ada. R. Evid., and that he should not have been permitted to give expert testimony in the proceedings. Section 41-22-13(1), Ala. Code 1975, a part of the AAPA, provides, in part, that, in contested cases, ~
“[t]he .rules of evidence as applied in nonjury civil cases in the circuit courts of this state shall be followed. When necessary to ascertain facts not reasonably susceptible of proof under those rules, evidence not admissible thereun *960 der may be admitted (except where precluded by statute) if it is of a type commonly relied upon by reasonably prudent persons in the conduct of their affairs.”
Although the Alabama Rules of Evidence are applicable to administrative proceedings, “the [AAPA] does relax the rules of evidence in some degree in administrative proceedings....” Screws v. Ballard, 574 So.2d 827, 829 (Ala.Civ.App.1990).
Effective November 28, 2011, our supreme court amended Rule 702. That amendment was made following the enactment by the Alabama Legislature of Act No. 2011-629, Ala. Acts 2011, codified at § 12-21-160, Ala.Code 1975. Before the amendments, Rule 702 provided:
“If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.”
The 2011 amendment designated the existing language of Rule 702 as subsection (a) and added the following subsection (b):
“(b) In addition to the requirements in section (a), expert testimony based on a scientific theory, principle, methodology, or procedure is admissible only if:
“(1) The testimony is based on sufficient facts or data;
“(2) The testimony is the product of reliable principles and methods; and
“(3) The witness has applied the principles and methods reliably to the facts of the case.
“The provisions of this section (b) shall apply to all civil state-court actions commenced on or after January 1, 2012. In criminal actions, this section shall apply only to nonjuvenile felony proceedings in which the defendant was arrested on the charge or charges that are the subject of the proceedings on or after January 1, 2012. The provisions of this section (b) shall not apply to domestic-relations cases, child-support cases, juvenile cases, or cases in the probate court. Even, however, in the cases and proceedings in which this section (b) does not apply, expert testimony relating to DNA analysis shall continue to be admissible under Ala.Code 1975, § 36-18-30.”
Rule 702, Ala. R. Evid.[3]
The intent of the amendment was to provide additional criteria for a trial court to consider when an opposing party properly challenges the qualifications of a proposed expert witness by applying a process and procedure similar to the process and procedure established by the United States Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Rule 702(b) does not, however, apply to all expert testimony; rather, it applies only to testimony “based on a scientific theory, principle, methodology, or procedure.” Rule 702(b) also does not apply to all proceedings in which the Alabama Rules of Evidence are applicable; rather, it applies only to the specific types of cases listed in subsection (b). The parties to this case do not contest that administrative proceedings are considered “civil state court actions” for purposes of Rule 702(b). Therefore, our analysis does not *961 address that issue. Helen Keller does riot contend that Falls’s testimony should have been excluded under Rule 702 as it existed before the amendment, i.e., that Falls was not qualified under Rule 702(a). Instead, Helen Keller contends that Falls was not qualified under Rule 702(b)(l)-(3), the provisions added by the 2011 amendment. Therefore, the threshold issue to be resolved is which version of Rule 702 is applicable to the admission of Falls’s testimony.
Because Rule 702(b) does not apply to any civil proceeding that was not “commenced on or after January 1, 2012,” our determination hinges on when the administrative proceeding involving a contested case was “commenced” urider AAPA. As noted above, RegionalCare filed its CON application on December 30, 2011, two days before the date Rule 702(b) became effective. RegionalCare contends that the administrative proceeding was commenced when it filed the CON application and that, thus, the amended Rule 702 is inapplicable to the present case. Helen Keller contends that Rule 702(b) is applicable because, it argues, the administrative proceeding became a contested case on March 1, 2012, when it filed a. notice of intervention and opposition to RegionalCare’s CON application with SHPDA.
In Huntsville Housing Authority v. State of Alabama Licensing Board for General Contractors, 179 So.3d 146 (Ala.Civ.App.2014), this court addressed what constitutes a contested case under the AAPA, stating:
“The AAPA, which was enacted by Ala. Acts 1981, Act No. 81-855, ‘is intended to provide a minimum procedural code for the operation of all state agencies when they take action affecting the rights and duties of the public.’ § 41-22-2(a), Ala.Code 1975.
“Section 41-22-26, Ala.Code 1975, provides, in part: ‘[I]t is the express intent of the Legislature to replace all provisions in statutes of this state relating to ... agency orders, administrative adjridication, or judicial review thereof that are inconsistent with the provisions of th[e AAPA].’
“Section 41-22-3, Ala.Code 1975, defines, among other terms, ‘contested case,’ ‘license,’ and ‘licensing’ as follows:
“‘(3) Contested case. A proceeding, including but not restricted to ... licensing, in which the legal rights, duties, or privileges of a party are required by law to be determined by an agency after an opportunity for hearing..
“ ‘(4) License. The whole or part of any agency franchise, permit, certificate, approval, registration, charter, or similar form of permission required by law,' but not a license required solely for revenue purposes when issuance of the license is rnerely a ministerial act.
“‘(5) Licensing. The agency process respecting the grant [or] denial[ ] ... of a license.... ’
“Sections 41-22-12 through 41-22-18, Ala.Code 1975, set forth the procedures to follow iri coritested. cases, and § 41-22-19(a), AlaCodé 1975, provides that ‘[t]he provisions of [the AAPA] concerning contested cases shall apply to the grant [or] denial ... of a license.’ Section 41-22-15, Ala.Code 1975, provides, in part: ‘[I]n a contested case, a majority of the offíciáls of the agency who are to render the final order must be in accord for the decision of the agency to be a final decision.’ Section 41-22-16(a), Ala.Code 1975, requires the final order in a contested case tó be in writing, and § 41-22-16(d), Ala.Code 1975, sets forth the procedure for an agency to notify a *962 party,of a final decision in a contested case.”
179 So.3d at 151.
Additionally, Rule 41Ó-1-8-.01, Ala. Admin. Code (SHPDA), requires a hearing on all.CON applications. That rule provides, in part:
“Each application for a Certificate of Need shall be accorded a public hearing during the course of the project’s review, which will be held at the monthly meeting of the Certifícate of Need Review Board unless the applicant or intervenor of record shall have timely requested that the application or competing applications be assigned to an Administrative Law Judge for a contested hearing pursuant to the requirements of the Alabama Administrative Procedure Act....”
Under the AAPA, a CON is considered a license and the process for seeking a CON constitutes a licensing process. Because the filing of a CON application involves a licensing process, pursuant to which privileges of a party are required by law to be determined by an agency after an opportunity for hearing, the filing of an application for a CON initiates a contested case under the AAPA. Therefore, Region-alCare’s filing of the CON application on December 30, 2011, constituted the commencement of a contested case. Rule 702(b) was not in effect when Regional-Care filed its CON application. Accordingly, Falls’s testimony was not subject to exclusion under Rule 702(b), and no reversible error has been established on this issue. Because the 2011 amendment to Rule 702 is not applicable, we pretermit a discussion of whether Falls’s ‘testimony would be admissible under Rule 702(b).

Conclusion

For the foregoing reasons, we affirm the judgment of the circuit court upholding the CONRB’s determination to grant a 280-bed CON to RegionalCare.
AFFIRMED.
THOMPSON, P.J., and PITTMAN and MOORE, JJ., concur.
THOMAS, J., concurs specially.

.
"In the health-care-services regulatory scheme, the terms ‘SHPDA’ and ‘CONRB’ are deemed synonymous and are used interchangeably. Ala. Admin. Code (SHPDA) Rule 410-1-2-.0I. For ease of understanding, we generally refer to the panel of individuals that holds hearings on CON applications as the CONRB, while using the term SHPDA to refer to the agency in its more general regulatory capacity.”
Ex Parte STV One Nineteen Sr. Living, LLC, 161 So.3d 196, 199 n. 2 (Ala.2014).

. The version of § 22-21-27S(6) in effect at the time RegionalCare filed the CON application provided, in part, that "[a]ny aggrieved party to a final decision of SHPDA may appeal the final decision of SHPDA to the circuit court in the county in which the applicant resides or of the county in which the applicant is situated or in which the new institutional health service being applied for is located.” That statute was amended by Act No. 2012-294, Ala. Acts 2012, § 1, to provide, in part, that ‘‘[a]ny aggrieved party to a final decision of SHPDA may appeal the final deci *953 sion of SHPDA to the Court of Civil Appeals.” Pursuant to § 3 of that act, the amendment had an effective date of May 8, 2012, and is applicable only to any CON application filed after the effective date. Because Regional-Care filed its CON application on December 30, 2011, the amendment to § 22-21-275(6) is not applicable tq this case, and Helen Keller correctly appealed the matter to the circuit court.

. The amendment to Rule 702 also added subsection (c), which provides: "(c) Nothing in this rule is intended to modify, supersede, or amend any provisions of the Alabama Medical Liability Act of 1987 or the Alabama Medical Liability Act of 1996 or any judicial interpretation of those acts.”